**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TERESIA YARN,<br><br>　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>ROBERT WILKIE, Secretary of Veterans Affairs,<br><br>　　　　　　　　　　　Defendant. | Case No.: 3:19-CV-0893 W (KSC)<br><br>**ORDER GRANTING DEFENDANT'S SUMMARY-JUDGMENT MOTION [DOC. 33]** |

　　　Pending before the Court is a summary-judgment motion filed by Defendant Robert Wilkie, Secretary of Veterans Affairs. Plaintiff Teresia Yarn opposes.

　　　The Court decides the matter on the papers submitted and without oral argument. See Civ. L.R. 7.1(d.1). For the reasons that follow, the Court **GRANTS** the motion [Doc. 33].

//

//

## I.  FACTUAL BACKGROUND

The central issue in this motion is whether Defendant violated the Rehabilitation Act by unreasonably delaying in replacing Plaintiff Teresia Yarn's office air purifier. Based on the undisputed facts as established by the parties' evidence, the Court finds Defendant did not violate the Rehabilitation Act.

### A.  Yarn worked for the VA's Anesthesia Service, but her office was located elsewhere in the complex.

In August 2004, the VA San Diego Healthcare System ("VA") hired Plaintiff Teresia Yarn, and in April 2005, she became a Program Support Assistant for Anesthesia Service. (*Jt. Statement* [Doc. 35] No. 1.) Yarn's direct supervisor was Administrative Officer Linda DeKoster, and her second-line supervisor was Dr. Piyush Patel, Chief of Anesthesia Service. (*Id.* No. 2; *DeKoster Decl.* [Doc. 33-3] ¶ 3.)

Throughout her employment, Yarn has been a member of the Service Employees International Union ("SEIU")/National Association of Government Employees ("NAGE"). (*Jt. Statement* No. 3.) In January 2016, she voluntarily transferred to the SEIU/NAGE Union Office, where she has worked full-time as Vice President and then President. (*Id.* No. 4.) While working for the Union, Yarn has continued to report to DeKoster for purposes of timekeeping and leave requests, but she is not physically located in Anesthesia Service. (*Id.* No. 5.)

### B.  In 2009, Yarn was provided an air purifier without going through the formal accommodation process.

In or around 2009, Yarn and two other employees in Anesthesia Service requested air purifiers, which the VA provided without requiring them to go through the formal accommodation process. (*Jt. Statement* No. 9; *DeKoster Decl.* ¶ 5.) As a result, Yarn was not required to provide medical documentation supporting her need for the air purifier. (*DeKoster Decl.* ¶ 5.)

In addition to the air purifier, the VA has also provided Yarn with ergonomic equipment, including an ergonomic chair, desk, mouse and keyboard. (*Jt. Statement* No. 8.) And at various periods from July 23, 2013, through September 4, 2017, the VA has approved Yarn's multiple requests for intermittent and continuous leave under the Family Medical Leave Act ("FMLA"). (*Id.* No. 7.)

### C. In February 2017, Yarn informed Radiation Safety Officer Rene Michel that there was a problem with her air purifier.

Rene Michel is the VA's Radiation Safety Officer, responsible for ensuring that the facility complied with all policies and regulations regarding radiation protection and the use of radioactive materials. (*Michel Decl.* [Doc. 33-5] ¶ 2.) In addition, for approximately six years, he oversaw the VA's ergonomics program. (*Id.*)

On February 2, 2017, Yarn emailed Michel for help with her ergonomic desk. (*Michel Decl.* ¶ 3; *Def's Ex. 3* [Doc. 33-1] pp. MSJ-093–094.) While Michel was helping Yarn with her desk, she mentioned an issue with her air purifier. (*Michel Decl.* ¶ 4.) Although Michel was not responsible for maintaining it, he responded the same day and informed her that "[e]ach service is responsible for purchasing and maintaining their air purifiers" and he explained that her purifier "has a permanent filter that needs to be vacuumed regularly" and it uses a prefilter that her service can buy. (*Pl's Ex. A* [Doc. 34-2] p. 2 of 7.) The email also included a link to the service manual for the air purifier. (*Michel Decl.* ¶ 4.)

### D. On March 1, 2017, Yarn responded to Michel's email and notified her direct supervisor that the air purifier needs to be replaced.

On March 1, 2017, Yarn responded to Michel's February 2 email and stated that she "put a new filter in the air cleaner" but that it was still not working. (*Pl's Ex. A* p. 2 of 7.) Michel then reminded her that "I believe your service is responsible for taking care

3

of it.  Let me check with [John Baldwin]."  (*Id.*)  Later that day, Baldwin sent Yarn an email stating,

> We purchased the original cleaner for you which fulfilled our obligation for your reasonable accommodation.  What have you done to have the air cleaner repaired or at least have it looked at by a competent service consultant?

(*Id.* p. 3 of 7.)  A couple hours later, Yarn emailed Baldwin, Michel and her direct supervisor, DeKoster:

> Please clarify your response.  I requested the reasonable accommodation due to my ADA disability.  As I stated in my following message the air cleaner is no longer working.  The indoor air quality is poor and I am experiencing breathing difficulty due to the poor indoor air quality.
>
> Would you like me to call OSHA to help with the testing of the indoor air quality?  Sharon Schubert also suffered with breathing issues due to the poor air quality in the office.

(*Id.* p. 4 of 7.)

Yarn's email was the first notice DeKoster received regarding Yarn's demand for a new air purifier.  (*Jt. Statement* No. 12.)  At 7:22 the next morning, DeKoster responded:

> This is the first I've heard of this problem. [¶] We can order new air filters or a new air purifier. [¶] Just let me know what you need and send the product info and Amy will place the order.

(*Pl's Ex. A* p. 4 of 7.)  Yarn quickly responded: "Product info – Honeywell air cleaner with HEPA filter. [¶] Will you be sending someone to pick this one up?"  (*Id.* p. 6 of 7.)  A few hours later, DeKoster emailed Yarn that "I'll arrange for a turn-in and Logistics will pick it up" and she asked Yarn for the air purifier's "brand and serial number and room location."  (*Id.*)  In response, Yarn provided the room location and asserted that she had already provided the "requested information" in her previous email.  (*Id.*)  But in her deposition, Yarn admitted that she did not provide the serial number.  (*Def's Ex. 1* [Doc. 33-1] p. MSJ-050; *DeKoster Decl.* ¶ 10.)

4

Although Yarn did not provide the serial number, DeKoster instructed one of her employees to order a new air purifier. (*DeKoster Decl.* ¶ 13.) DeKoster was told, however, that the process had changed since 2009, when Yarn first requested an air purifier. (*Id.*) Instead of being able to order one with Anesthesia Service's discretionary funds, Yarn would need to go through the formal accommodation process. (*Id.*)

Shortly after DeKoster was told the process had changed, Yarn filed a workers' compensation claim regarding an exacerbated back injury. (*DeKoster Decl.* ¶ 14.) On March 28, Yarn began a five-month leave of absence due to her back injury. (*Jt. Statement* No. 15.)

### E. While on disability leave, Yarn emailed DeKoster about the air purifier.

On June 21, while Yarn was still on leave, she emailed DeKoster stating that she "need[s] my air purifier to do my job," that she had "provided the requested ordering information on March 02, 2017," and that the "broken air purifier has not been replaced." (*Def's Ex. 2* [Doc. 33-1] p. MSJ-080; *DeKoster Decl.* ¶ 15.) After receiving Yarn's email, DeKoster spoke with Dr. Patel (Chief of Anesthesia Service), who agreed that Yarn should receive a new air purifier despite not having gone through the formal accommodation process. (*DeKoster Decl.* ¶¶ 3, 16; *Dr. Patel Decl.* [Doc. 33-4] ¶ 11; *Def's Ex. 3* p. MSJ-090.) DeKoster then contacted Michel at Radiation Safety and asked if he could provide Yarn with an air purifier. (*Id.*)

On June 27, DeKoster emailed Yarn and stated that she "spoke with Rene Michel about a week or so ago, and he agreed that he would provide the air purifier. [¶] When you return to your office, contact Rene, and he will come to your office to assess what kind of purifier you need." (*Def's Ex. 3* pp. MSJ-096–097.)

On August 17, DeKoster emailed Steven Schneblin, the Union President, to ask if they could pick up Yarn's broken air purifier. (*Def's Ex. 2* p. MSJ-081.) In response, Schneblin asked if and when it would be replaced. (*Id.*) DeKoster responded:

> Yes, absolutely. I've emailed Teresia that when she returns to work to let me know and I will immediately order a new one. Does that sound okay? Do you know when she would be coming back to work?

(*Id.*) Schneblin replied that he did "not know … when Vice President Yarn will return to work in the Union Office." (*Id.*) He copied Yarn on the email. (*Id.*) There is no evidence indicating Yarn ever notified DeKoster when she planned to return.

### F. DeKoster sends Yarn a memo ordering her to return to work on September 5 but stating she may be eligible for additional FMLA leave.

On approximately August 30, 2017, DeKoster sent Yarn a memo ordering her to return to duty on September 5, 2017. (*DeKoster Decl.* ¶ 22.[1]) The memo also notified Yarn that "she may be eligible for up to 12 weeks of leave without pay ('LWOP') under the FMLA, and it provided the contact information for HR." (*Id.*)

In her declaration DeKoster stated that Human Resources ("HR") prepared the letter and directed her to send it to Yarn. (*DeKoster Decl.* ¶ 22.) DeKoster's uncontradicted testimony also explained that Yarn had invoked FMLA leave, but she had submitted conflicting medical documentation, and despite repeated requests for clarification, Yarn had not provided updated medical information regarding her restrictions and/or ability to return to work. (*Id.* ¶ 23.) As a result, HR initially denied Yarn's request for FMLA leave. Yarn, however, remained off work, prompting the August 30, 2017 memo. (*Id.*)

### G. On September 5, Yarn returned to work but did not notify Michel.

On Tuesday, September 5, Yarn returned to work at the Union office. (*Jt. Statement* No. 22.) There is no evidence indicating she notified Michel that she returned.

---

[1] Neither party appears to have attached the memo as an exhibit.

6

On Friday, September 15, DeKoster saw Yarn in the hallway on the first floor. (*DeKoster Decl.* ¶ 27.) DeKoster then emailed Yarn that she "hadn't realized that you returned to work last week" and that she could "arrange to have an air purifier brought to your office." (*Def's Ex. 2* p. MSJ-082.) Yarn responded that the correspondence "I received from you via mail stated that I was to return to duty on 09/05/2017." (*Id.*) Yarn also informed DeKoster that Monday "will be a good day to drop it off" and that she had "called out since my return due to unhealthy breathing conditions." (*Id.*)

The following Monday, DeKoster emailed Union President Schneblin and asked "what would be a good time to deliver the air purifier to Teresia's office." (*Def's Ex. 2* p. MSJ-083.) He responded that "Wednesday . . . would be a good date and time." (*Id.*) DeKoster then emailed Michel that she would come by the Safety office to pick up an air purifier, which was being borrowed from an employee who was on extended leave. (*DeKoster Decl.* ¶ 32; *Michel Decl.* ¶¶ 8, 9; *Def's Ex.* 6 [Doc. 33-1] p. MSJ-105.)

On Tuesday, Yarn returned to work and emailed DeKoster stating that "I am having issues breathing" and asked if someone could deliver the air purifier "today." (*Def's Ex. 2* p. MSJ-086.) Approximately 20 minutes later, DeKoster emailed Yarn that it would be delivered "in about 15 minutes." (*Id.*; *Jt. Statement* No. 31.) DeKoster then delivered the borrowed air purifier to Yarn. (*DeKoster Decl.* ¶ 33.)

In November 2017, the employee who had been on extended leave returned to work and needed the air purifier back. (*DeKoster Decl.* ¶ 35.) DeKoster, therefore, decided to use her own money to purchase a new air purifier so Yarn would not have to go through the formal accommodation process. (*Id.*)

On November 12, DeKoster purchased a new Honeywell air purifier. (*DeKoster Decl.* ¶ 36.) On November 20, she officially donated the machine to Anesthesia Service so that it could be given to Yarn. (*Id.* ¶ 27; *Def's Ex. 7* [Doc. 33-1].) The same day, she delivered the new air purifier to Yarn and picked up and returned the borrowed air purifier. (*Id.*)

### H. Yarn's administrative claims.

On March 14, 2017, Yarn initiated contact with an EEO counselor. (*Def's Ex. 8* [Doc. 33-1] pp. MSJ-112–113.) She alleged, among other things, that "[s]ince March 1, 2017, and to the present, the facility failed to replace or fix the broken air filter as a reasonable accommodation and to engage in the interactive process." (*Id.* p. MSJ-114.) Then on June 21, 2017, Yarn filed a formal EEO Complaint of Employment Discrimination, alleging, among other claims, failure to accommodate and failure to engage in the interactive process. (*Def's Ex. 9* [Doc. 33-1] p. MSJ-117.)

On April 18, 2018, the VA filed a motion for a decision without a hearing under 29 C.F.R. § 1614.109(g). On February 11, 2019, the VA's Office of Employment Discrimination Complaint Adjudication issued its Final Agency Decision, concluding that Yarn failed to establish she was discriminated against or subjected to unlawful harassment based on a disability or reprisal. (*See Def's Ex. 16* [Doc. 33-1].)

### I. Yarn's files this lawsuit.

On May 13, 2019, Yarn filed this lawsuit against the VA. (*See Compl.* [Doc. 1].) The Complaint asserts five causes of action for: (1) disability discrimination; (2) hostile work environment based on disability and reprisal; (3) failure to accommodate; (4) failure to engage in the accommodation process; and (5) reprisal. (*See id.*)

On January 5, 2021, this Court granted the parties' joint motion to dismiss the First, Second, Fourth, and Fifth Causes of Action. (*See Dismissal Order* [Doc. 32].) Accordingly, the sole remaining cause of action is for failure to accommodate in violation of the Rehabilitation Act, arising from Yarn's request to fix or replace her broken air purifier. (*See Def's Ex. 18* [Doc. 33-1].)

The VA now seeks summary judgment on Yarn's failure to accommodate claim. Yarn opposes.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir.

1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III. DISCUSSION

In the Complaint, Yarn's failure to accommodate cause of action appears to be based on the theory that the VA improperly denied her accommodation request. (*See Compl.* ¶ 78.) Because there is no dispute that Yarn was provided with a new air purifier (*Jt. Statement* No. 34), Yarn now claims the VA unreasonably delayed in replacing her air purifier: "In this case Ms. Yarn claims that the Defendant failed to accommodate her because of the inexcusable delays in providing her with a device (air purifier) that they acknowledge that she needed to do her job." (*See Opp'n* [Doc. 34] 4:12–14.)

### A. Rehabilitation Act

The Rehabilitation Act requires a federal employer to reasonably accommodate "the known physical or mental limitations of an otherwise qualified individual with a disability." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting 42 U.S.C. § 12112(b)(5)(A)). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128,

1137 (9th Cir. 2001) (citing <u>Barnett v. U.S. Air, Inc.</u>, 228 F.3d 1105, 1112 (9th Cir.2000) (en banc), vacated on other grounds).  "The interactive process requires: (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." <u>Zivkovic</u>, 302 F.3d at 1089. "'Liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown' in the interactive process." <u>Id.</u> (quoting <u>Beck v. Univ. of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1137 (7th Cir.1996)).

### B. The V.A. did not unreasonably delay.

The parties contend, and this Court's independent research confirms, there are no Ninth Circuit cases involving a violation of the Rehabilitation Act for unreasonably delaying in providing an accommodation.  Accordingly, the parties rely on authority from other circuits.

In <u>McCray v. Wilkie</u>, 966 F.3d 616 (7th Cir. 2020), for example, plaintiff Scott McCray, who is African American, was employed by the Department of Veterans Affairs as a Mental Health Case Manager.  Among his duties was transporting clients to clinical appointments.  McCray suffered from various physical and mental disabilities related to his 8-years of military service.

In July 2012, McCray asked his supervisor to replace the van he used to transport clients to appointments because the van was hurting his knee. <u>Id.</u> at 619.  In October, a specialist evaluated the van and "concluded that the 'knot' on McCray's knee seemed to be caused by a lack of leg room . . . ." <u>Id.</u>  In November, the van "began to 'buck[] and jerk[]' in traffic," so McCray was given a temporary replacement in December, which was worse than the original van. <u>Id.</u>  McCray continued to ask for an appropriate replacement, but "there was no dialogue with McCray about what else could be done and on what timeline . . . ." <u>Id.</u> at 622.  Finally, in June 2013, approximately19 days after threatening to file an EEO complaint, McCray's van was replaced. <u>Id.</u> at 619.  The

following year, "shortly after a white female coworker complained about her van bucking and jerking, all of the case managers received new vans." Id.

In McCray's subsequent lawsuit for failing to accommodate his disability, the district court granted the VA's motion to dismiss reasoning that there was no violation because McCray was ultimately given a new van. Id. 620. The Seventh Circuit reversed holding that "[a]n unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate his disability that violates the Rehabilitation Act." Id. at 621. According to the court,

> [w]hether a particular delay qualifies as unreasonable necessarily turns on the totality of the circumstances, including, but not limited to, such factors as the employer's good faith in attempting to accommodate the disability, the length of the delay, the reasons for the delay, the nature, complexity, and burden of the accommodation requested, and whether the employer offered alternative accommodations.

Id. In evaluating if McCray's complaint stated a claim, the Seventh Circuit found that McCray's accommodation was "not an especially complex or burdensome accommodation" since the VA provided new vans to all counselors after the female employee complained. Id. at 621. The VA's "lack of dialogue" regarding what else could be done for McCray suggested it violated the duty to engage in the interactive process. And the timing of when the VA provided McCray with a new van—i.e., shortly after he threatened to file an EEOC charge—further demonstrated the VA's bad faith. Id. at 622. Under these circumstances, the Seventh Circuit concluded "we cannot rule out the possibility that the factfinder might conclude the 11-month delay in accommodating McCray's disability was unreasonable." Id.

In contrast to the facts alleged in McCray, the evidence here establishes the VA did not unreasonably delay in accommodating Yarn. First, the undisputed facts establish the VA's good faith in replacing her air purifier. There is no dispute that on March 1, 2017 Yarn first notified her supervisor, DeKoster, that her air purifier was not working. (*Jt. Statement* No. 12; *see also* Pl's Ex. A p. 4 of 7.) The next day, DeKoster informed Yarn

12

they would replace the air purifier and requested the product's serial number. (*Pl's Ex. A* pp. 4 of 7, 6 of 7.) Although Yarn did not provide the serial number (*Def's Ex. 1* p. MSJ-050), DeKoster then instructed one of her employees to order the machine but was told the process had changed and Yarn would have to go through the formal accommodation process. (*DeKoster Decl.* ¶13.) Shortly thereafter, Yarn filed a worker's compensation claim related to her back injury and on March 28 Yarn went on disability leave for five months. (*Id.* ¶ 14.) While Yarn was on disability leave, DeKoster and Dr. Patel agreed to replace her air purifier despite Yarn's failure to go through the formal accommodation process. (*DeKoster Decl.* ¶¶ 13,16; *Def's Ex. 3* pp. MSJ-090, MSJ-096–097.) When DeKoster discovered on September 15 that Yarn had returned to work, she emailed Yarn to "arrange to have an air purifier brought to your office." (*DeKoster Decl.* ¶ 15; *Def's Ex. 2* p. MSJ-082.) Although Yarn asked her to bring the air purifier the following Monday (*id.*), Union President Schneblin instructed DeKoster to deliver it on "Wednesday, September 20th . . . ." (*id.* p. MSJ-083).[2] When Yarn returned to work on Tuesday and asked DeKoster to deliver the air purifier "today," DeKoster picked up the replacement air purifier from Michel and delivered it to Yarn's office. (*DeKoster Decl.* ¶ 32; *Michel Decl.* ¶¶ 8, 9; *Def's Ex. 6* p. MSJ-105.) Based on these undisputed facts, the Court finds the VA acted in good faith in accommodating Yarn.

Next, the undisputed facts establish that the length of the delay in accommodating Yarn was short, lasting only 32 days. Again, there is no dispute Yarn first notified DeKoster on March 1. (*Jt. Statement* No. 12; *see also Pl's Ex. A* p. 4 of 7.) Twenty-eight days later, Yarn left on disability leave for an unrelated back injury. (*Jt. Statement* No. 15.) While on disability leave, DeKoster instructed Yarn to contact Michel when she returned from leave. (*Def's Ex. 3* pp. MSJ-096–097.) There is no evidence indicating Yarn contacted Michel when she returned and DeKoster's uncontradicted testimony is

---

[2] Yarn was not at work on Monday, September 15. (*Jt. Statement* No. 27.)

13

that she first saw Yarn on Friday, September 15. (*DeKoster Decl.* ¶ 15; *Def's Ex. 2* p. MSJ-082.) Because DeKoster delivered the air purifier four days later (*DeKoster Decl.* ¶ 32), the VA's total delay in accommodating Yarn was only thirty-two days (i.e., March 1–28 and September 15–19).

The undisputed facts also confirm the VA had good reasons for the time it took to accommodate Yarn. The VA provided uncontroverted evidence that the process for providing Yarn with an air purifier was more burdensome and difficult than in 2009, when she received the first machine. According to DeKoster, "[i]nstead of being able to order [an air purifier] with the service's discretionary funds, [Yarn] would need to go through the formal reasonable accommodation process, which often requires proof of medical documentation in support of the requested accommodation." (*DeKoster Decl.* ¶ 13.) Significantly, there is no dispute Yarn never went through the accommodation process for the replacement air purifier. (*Jt. Statement* No. 9; *DeKoster Decl.* ¶ 5; *Def's Ex. 3* p. MSJ-097.) Dr. Patel also explained that the Anesthesia Service's discretionary budget did not cover replacing Yarn's air purifier because the funds were "focused more on patient care and are specifically ear marked for things like travel and continuing education for Nurse Anesthetist." (*Dr. Patel Dec.* ¶ 9.) And Michel testified that it usually "takes time to order equipment due to government protocols and budgetary restrictions…." (*Michel Decl.* ¶ 9.) Notably, Yarn provides no evidence contradicting the statements by DeKoster, Dr. Patel and Michel. Accordingly, the Court finds the uncontradicted evidence establishes the process for providing Yarn an air purifier had become more burdensome and complicated, thereby justifying the VA's "delay."

The evidence further demonstrates that despite the service's budgetary limitations, DeKoster and Michel were able to figure out a temporary solution to provide Yarn with a working air purifier: by borrowing one from another employee on extended leave. (*DeKoster Decl.* ¶ 32; *Michel Decl.* ¶¶ 8, 9; *Def's Ex.* 6 p. MSJ-105.) And when the employee returned to work, DeKoster used her own money to purchase and donate an air purifier to the VA so it could be provided to Yarn. (*DeKoster Decl.* ¶ 35.) These facts

also support a finding that the VA did not violate the Rehabilitation Act.  See McCray, 966 F.3d at 621 (recognizing that the employer offering alternative accommodations is relevant in evaluating an unreasonable delay claim).

Finally, also relevant is whether both parties engaged in good faith in the interactive process.  "[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." Taylor v. Phoenixville School Dist., 184 F.3d 296, 312 (3rd Cir. 1999) (quoting Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th Cir. 1996) (internal quotation marks omitted).  Here, the evidence confirms that while the VA consistently engaged in the interactive process in good faith, Yarn did not.

The emails attached to the parties' briefs establish that the VA responded to *all* of Yarn's communications regarding the air purifier, usually within hours.  (*See generally Def's Exs. 2–4* [Doc. 33-1]; *Pl's Ex. A*.)  In contrast, on March 2, 2017, DeKoster asked Yarn for the serial number for the air purifier. (*Pl's Ex. A* p. 6 of 7.)  Though Yarn responded by asserting she had already provided the information, Yarn admitted during her deposition that she never provided the serial number:

> Q.   And you did not provide her with the serial number; is that correct?
>
> A.   I provided her with the information that was on the Honeywell air cleaner and the HEPA filter.  That was the only information that was up there.  It didn't have a serial number, that I saw.

(*Def's Ex. 1* p. MSJ-050.[3])

---

[3] While Yarn's testimony suggests there was no serial number on the machine, she cites no evidence indicating she ever notified DeKoster.  Instead, her email falsely insisted she provided the information.

Yarn also failed to communicate regarding her return from disability leave. DeKoster's June 27 email specifically instructed Yarn to notify "Rene" when she returned to work. (*Def's Ex. 3* pp. MSJ-096–097.) Yarn failed to do so. Similarly, on August 17, Union President Schneblin copied Yarn on DeKoster's email asking when Yarn would return. (*Def's Ex. 2* p. MSJ-081.) Again, there is no indication Yarn responded.

In her opposition, Yarn attempts to diminish her failure to notify DeKoster about her return from disability leave by arguing DeKoster should have known because of the August 30 memo ordering Yarn to return to duty. (*Opp'n* 3:12–14.) This argument is unavailing for two reasons. First, Yarn's June 27 email specifically instructed Yarn, "[w]hen you return to your office [after disability leave], *contact Rene*, and he will come to your office to assess what kind of purifier you need." (*Def's Ex. 3* pp. MSJ-096–097, emphasis added.) Thus, Yarn was supposed to contact Rene—not DeKoster—to replace the air purifier. Second, although the memo ordered Yarn to return to duty, it also left open the possibility Yarn could extend her leave. As DeKoster testified, the memo informed Yarn "that she may be eligible for up to 12 weeks of leave without pay" under the FMLA, and it provided Yarn with HR's contact information. (*DeKoster Decl.* ¶ 23.) Yarn, therefore, could have reduced or extended her leave, depending on her medical needs. (*Id.* ¶ 24.) Given Yarn's history of FMLA leave (*see Jt. Statement* No. 7), it was not unreasonable to believe Yarn extended her leave beyond September 5. For these reasons, the Court finds that while the VA consistently engaged in good faith in the interactive process, Yarn did not.

Despite the overwhelming evidence establishing the VA did not unreasonably delay in providing Yarn a replacement air purifier, she raises several unsupported and unpersuasive arguments in her opposition. First, to increase the VA's "delay" in accommodating Yarn, she asserts "she first approached the Defendant about the air purifier" in early February, not March 1. (*Opp'n* 8:8–10.) This argument lacks merit for at least three reasons. First, as the VA points out, Yarn's argument contradicts the

allegation in her administrative case, wherein she alleged a failure to accommodate "[s]ince March 1, 2017…." (*Def's Ex. 8* p. MSJ-114.) It is also contrary to the Complaint's allegation that "[b]eginning *March 1, 2017* though [sic] September of 2017 the Agency failed to replace of [sic] fix Ms. Yarn's broken air filter which was provided to her as an accommodation." (*Compl.* ¶ 41, emphasis added.)

      Second, Yarn's argument assumes that her communication with Michel on February 2 triggered the VA's obligation to replace the air purifier. (*See Opp'n* 8:8–10, citing *Pl's Ex. A* p. 1–2.[4].) It did not. There is no dispute Yarn's direct supervisor was DeKoster and her second-line supervisor was Dr. Patel. (*Jt. Statement* No. 2.) Michel ws not Yarn's supervisor and instead oversaw radiation safety and the ergonomics program. (*Michel Decl.* ¶ 2.) And Yarn provides no evidence remotely suggesting Michel was the proper individual to contact about her need for an accommodation. In fact, to the extent Yarn was confused about who to contact, Michel's February 2 email to Yarn clarified that "[e]ach service is responsible for purchasing and maintaining their air purifiers." (*Pl's Ex. A* p. 7 of 7.) Moreover, the suggestion Yarn did not know who to notify is belied by her 13-years of employment with the VA and her ability to navigate through numerous requests for accommodation and intermittent and continuous FMLA leave requests. (*Jt. Statement* Nos. 7, 8.[5]) In short, no reasonable jury could find based on the evidence that Yarn's communication with Michel on February 2 triggered the VA's obligation to replace her air purifier.

      Third, even assuming for the sake of argument that Michel was the proper person to contact about the air purifier, the evidence establishes the VA did not unreasonably

---

[4] The only February communication identified in *Pl's Ex. A* pp. 1–2 is the February 2 email between Yarn and Michel.

[5] Yarn's discovery responses also suggest she understood that communications related to her disability were to be made to her first line supervisor Linda DeKoster, as well as her second line supervisor. (*See Def's Ex. 11* [Doc. 33-1] p. MSJ-133.)

17

delay from February 2 until March 1. Again, the email correspondence confirms that on the same day Yarn told Michel that her air purifier was not working, he responded by explaining the purifier "has a permanent filter that needs to be vacuumed regularly," that it used a prefilter that her service could buy, and he provided a link to the service manual for the air purifier. (*Pl's Ex. A* p. 2 of 7; *Michel Decl.* ¶ 4.) This evidence establishes that after Yarn complained about the air purifier, Michel immediately offered a possible solution. Yarn's next communication about the air purifier was sent on March 1. (*Pl's Ex. A* p. 2 of 7.) Under these undisputed facts, no jury could find the VA unreasonably delayed from February 2 to March 1. See Cloe v. City of Indianapolis, 712 F.3d 1171, 1178, 1179 (7th Cir. 2013) (Explaining that "[u]pon receiving an accommodation request, an employer is not required to provide the exact accommodation requested." Instead, the employer can attempt reasonable alternatives so long as it acts with reasonable speed to come up with new ones once it discovers the alternatives are insufficient).

Yarn also attempts to expand the VA's delay in providing her accommodation by arguing it should include the 5 months she was on disability leave. (*Opp'n* 7:7–8:3.) This argument lacks merit. See Terrell v. USAir, 132 F.3d 621, 628 (11th Cir. 1998) (rejecting plaintiff's contention that the time she was on medical leave should be included in calculating defendant's delay in providing the accommodation: "The only delay we consider is the time that Plaintiff was working at USAir without the drop keyboard.")

Next, Yarn's opposition disputes that she was provided an air purifier on September 19. (*Opp'n* 3:17–18.) This argument is confounding (and borderline sanctionable) given Yarn's admission in the joint statement that "the air purifier Plaintiff had been using since September 2017 belonged to another employee . . . ." (*Jt. Statement* No. 33.) Additionally, the evidence Yarn cites in support of her argument only bolsters the finding that Yarn received an air purifier on September 19. (*See Opp'n* 3:17–18,

citing *Pl's Ex. D* [Doc. 34-5].[6]) Yarn's argument is also contradicted by DeKoster's Declaration and Michel's Declaration.[7] (*See DeKoster Decl.* ¶ 33; *Michel Decl.* ¶ 10.)

Finally, Yarn also appears to be asserting that providing her with the borrowed air purifier on September 19, instead of a new one, is somehow evidence of a failure to accommodate. But Yarn provides no evidence that the borrowed air purifier did not work. Additionally, the law is well settled that an "employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002) (quoting E.E.O.C. v. Yellow Freight Sys. Inc., 253 F.3d 943, 951 (7th Cir.2001) (en banc) (citation and internal quotation marks omitted). Thus, this argument also lacks merit.

For all the reasons stated above, the Court finds under the totality of the circumstances, the VA did not unreasonably delay in accommodating Yarn.

## IV.   CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment [Doc. 33].

**IT IS SO ORDERED**

Dated:  November 23, 2021

Hon. Thomas J. Whelan
United States District Judge

---

[6] Pl's Ex. D consists of the emails discussed above that were sent on September 18 and 19 between DeKoster and Yarn, and DeKoster and Schneblin.

[7] It is notable that Yarn did not provide a declaration disputing under oath that she received the air purifier in September.